**EARTHWEB, INC., Plaintiff,**

v.

**Mark SCHLACK, Defendant.**

**No. 99 CIV. 10035(WHP).**

United States District Court,
S.D. New York.

Oct. 27, 1999.

Nathaniel H. Akerman, Andrew B. Lachow, Seyfarth, Shaw, Fairweather & Geraldson, New York, NY, for Plaintiff.

Catherine E. Reuben, Michael B. Golden, Shawn P. Landau, Robinson & Cole, LLP, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

This diversity action involves claims of breach of contract and misappropriation of trade secrets in the fluid and ever-expanding world of the Internet. Plaintiff EarthWeb, Inc. ("EarthWeb") moves for preliminary injunctive relief enjoining defendant Mark Schlack ("Schlack"), a former EarthWeb vice president responsible for "content" on the company's websites, from: (1) commencing employment with International Data Group, Inc. ("IDG"), and (2) disclosing or revealing EarthWeb's trade secrets to IDG or any third parties. For the reasons discussed below, the motion is denied.[1]

### Procedural History

EarthWeb filed this action on September 27, 1999. The next day, EarthWeb filed an order to show cause and temporary restraining order seeking, *inter alia*, to enjoin Schlack from commencing employment with IDG and from disclosing EarthWeb's trade secrets. After hearing argument from both parties, this Court entered a temporary restraining order granting that temporary relief.[2] At that time, EarthWeb offered to continue to pay Schlack his regular salary and benefits during the pendency of the temporary restraining order, and the Court incorporated that condition in its order. The Court also established an expedited briefing schedule and a return date of October 7,

1999 for EarthWeb's application for preliminary injunctive relief.

Over the next nine days, the parties conducted two depositions and submitted a significant volume of discovery material in connection with EarthWeb's motion. At defendant's request and upon consent of the parties, the Court adjourned the motion return date to October 12, 1999. The parties appeared on that date and engaged in lengthy oral argument. At the conclusion of that argument, the Court extended its temporary restraining order pending a determination of this motion.

### Findings of Fact and Conclusions of Law

#### A. Background

EarthWeb, which was founded in 1994, provides online products and services to business professionals in the information technology ("IT") industry. (Gollan Aff. ¶ 3; Compl. ¶¶ 5, 6) IT professionals are individuals who manage and run computer systems, develop software and perform related tasks for the companies that employ them. (Schlack Aff. ¶ 1) EarthWeb employs approximately 230 individuals in offices located in New York City and around the country. (Gollan Aff. ¶ 3; Compl. ¶ 5) Its stock is publicly traded. (Gollan Aff., Ex. A)

EarthWeb operates through a family of websites offering IT professionals information, products and services to use for facilitating tasks and solving technology problems in a business setting. (Gollan Aff. ¶ 3) Some of EarthWeb's websites are free to the user, while others require a subscription fee. EarthWeb's websites contain, *inter alia*, (1) articles on subjects

---

1. The parties have also moved separately for an order sealing certain portions of the record on this motion. These applications are addressed in Section E of this memorandum and order.

2. A third branch of EarthWeb's temporary restraining order would have directed Schlack to "return to [EarthWeb] all trade secret documents and confidential and pro-

prietary materials, whether originals or copies or in electronic data form, in his possession, custody [or] control ...." However, EarthWeb conceded in open court on September 28, 1999 that it had no evidence suggesting that Schlack had taken such materials. Accordingly, that language was stricken from the temporary restraining order.

tailored to IT professionals that discuss and examine the implementation of technology in the corporate environment; (2) lists of articles, training materials, periodicals, books and downloads organized and indexed by subject matter; (3) compilations and aggregations of technical news; (4) a reference library of full-text versions of technical books; and (5) an online forum of discussion groups. (Gollan Aff. ¶ 4)

EarthWeb obtains this content primarily through licensing agreements with third parties. (Gollan Aff. ¶ 9; Schlack Aff. ¶ 6) Advertising is EarthWeb's primary source of revenue. In 1998, the company generated approximately $3.3 million in revenue. (Gollan Aff. ¶ 4)

Schlack has worked in the publishing industry for the past 16 years. (Schlack Aff. ¶ 1) Prior to joining EarthWeb, Schlack had been employed as senior editor and/or editor-in-chief of several print magazines, such as *BYTE* and *Web Builder*. (Gollan Aff. ¶ 5; Schlack Aff. ¶ 3)

Schlack began his employment with EarthWeb in its New York City office on October 19, 1998, and he remained with the company until his resignation on September 22, 1999. His title at EarthWeb was Vice President, Worldwide Content, and as the name suggests, Schlack was responsible for the content of all of EarthWeb's websites. (Gollan Aff. ¶¶ 5, 6) Thus, as described in greater detail below, Schlack had overall editorial responsibility for what appeared on the websites.

Schlack permanently resides in Massachusetts. During his twelve-month tenure with EarthWeb, Schlack resided in a New York City hotel approximately two or three days per week at EarthWeb's expense. (Gollan Aff. ¶ 6) Schlack was one of ten vice presidents at EarthWeb. He served below two senior vice presidents, an executive vice president, and the chief executive officer. (Schlack Aff. ¶ 10)

On September 22, 1999, Schlack tendered to EarthWeb senior vice president William F. Gollan his letter of resignation. Upon inquiry by Gollan, Schlack revealed that he had accepted a position with ITworld.com, a subsidiary of IDG. According to EarthWeb, IDG is the world's leading provider of IT print-based information. (Schlack Aff. ¶ 9; Gollan Aff. ¶ 22) The company generates over $1 billion in annual revenues and publishes more than 280 monthly periodicals. (Reinstein Aff. ¶ 9; Gollan Aff. ¶ 22) The position IDG offered Schlack is based in Massachusetts and would provide him a significant increase in compensation.

### B. Schlack's Employment *with EarthWeb*

EarthWeb describes Schlack as one of its most important officers, while Schlack claims that EarthWeb has inflated the nature of his duties and responsibilities. Schlack also argues that the position waiting for him at IDG is so different that he would have no occasion to divulge any trade secrets belonging to EarthWeb. From those respective viewpoints, the parties have inundated the record with material concerning the extent to which Schlack had access to trade secrets and proprietary information. In particular, EarthWeb has produced copies of over 1,100 documents, a large percentage of which are intra-company e-mails, in order to show that Schlack reviewed and/or created this sensitive information. The trade secrets and other confidential information that EarthWeb claims are likely to be used and disclosed by Schlack to their detriment may be grouped into four broad categories: (1) strategic content planning; (2) licensing agreements and acquisitions; (3) advertising; and (4) technical knowledge. (Pl.'s Mem. at 11) Each category is addressed below.

### Strategic Content Planning

EarthWeb claims that Schlack's primary job responsibilities involved making all significant strategic decisions relating to content. The company also asserts that Schlack either authored or supervised the creation of the content plans for a number of EarthWeb websites launched

within the last year. (Gollan Reply Aff. ¶ 5) Thus, Schlack was involved in deciding what content EarthWeb licensed and how that content would be structured on its websites in order to reach specific types of IT professionals. Schlack was also involved in determining whether the users of a particular EarthWeb website should pay for access to the site, and if so, what the appropriate price should be. (Gollan Aff. ¶ 9) As a result, Schlack knows the specific target audience for each website, how EarthWeb aggregated content on those websites to reach the targeted audience, and how EarthWeb may intend to improve the content and delivery of particular websites. (Gollan Reply Aff. ¶ 6)

Schlack does not dispute the extent of his editorial involvement with EarthWeb's websites. Instead, he claims that he had virtually no interaction with senior management and therefore knows little about EarthWeb's overall business goals. (Schlack Aff. ¶ 16) He also contends that whatever he knows about EarthWeb's strategic planning is likely to become obsolete rather quickly because the company's websites are constantly changing. (Schlack Aff. ¶ 18)

Licensing Agreements and *Acquisitions*

During his employment, Schlack was involved in negotiating at least two licensing agreements with third parties, and he was generally aware of the terms and conditions of other such agreements. (Gollan Aff. ¶ 9; Schlack Aff. ¶ 23) Schlack also knows of companies whose content EarthWeb is interested in licensing. As vice president for content, Schlack often played a key role in determining whether particular content should be licensed, and if so, what the terms of the deal would be. (Gollan Reply Aff. ¶ 12) With respect to acquisitions, Schlack analyzed and evaluated websites and companies that EarthWeb later acquired. Schlack also knows of at least four companies that EarthWeb continues to view as desirable acquisitions. (Gollan Reply Aff. ¶ 9)

Schlack contends, and EarthWeb does not dispute, that the terms of EarthWeb's licensing agreements are frequently revealed by licensors as they continue to search for better deals. (Schlack Aff. ¶ 22) Schlack disputes the number of acquisitions in which he was actually involved, and claims that the mechanics of the deals were handled by a separate department at EarthWeb. (Schlack Aff. ¶ 20–21) Schlack also suggests that he analyzed prospective acquisitions simply by looking at their websites (Schlack Aff. ¶ 21), but the record indicates that his research also included meetings with high-level managers of those companies. (Gollan Reply Aff. ¶ 9; Dep/Schlack/31–33, 106)

It should be noted that EarthWeb does not allege that Schlack has retained copies of any licensing agreements or other sensitive documents concerning licensors. Schlack maintains that he does not remember the details of the licensing agreements which he worked on or approved. (Schlack Aff. ¶ 23) Similarly, Schlack claims that he is unaware of the terms of any proposed or pending acquisitions. As the person ultimately responsible for deciding what content would be posted on EarthWeb's websites, Schlack asserts that his role was limited to evaluating the content to be licensed or acquired and determining whether a deal should be pursued. (Gollan Reply Aff. ¶ 13)

*Advertising*

Schlack was also involved, albeit less directly, with EarthWeb's marketing and sales efforts. Schlack describes his role as "explain[ing] EarthWeb's editorial focus and how [it] might relate to the advertiser's customer." (Schlack Aff. ¶ 12) On occasion, Schlack joined members of EarthWeb's sales and marketing departments on business development calls in order to solicit advertising and sponsorships on the company's websites. (Gollan Aff. ¶ 11) According to EarthWeb, Schlack's efforts in this area would have allowed him to gain some insights into the specific audiences

that EarthWeb's advertisers were seeking to target. (Gollan Aff. ¶ 11) Schlack was also involved in the creation of custom publishing websites for EarthWeb's advertisers. (Gollan Reply Aff. ¶ 22)

However, Schlack's main function with respect to advertising appears to have been one of internal coordination. Schlack, as vice president of content, met regularly with senior managers for the sales and marketing departments so that each department could make certain that it was coordinating its efforts with the others. (Gollan Reply Aff. ¶ 20; Schlack Aff. ¶ 12) Schlack received sales and marketing updates at those meetings and was consulted with respect to a number of particular products and initiatives. (Gollan Reply Aff. ¶ 21) Here again, however, it should be noted that EarthWeb does not accuse Schlack of absconding with a list of advertisers or other confidential advertising information. EarthWeb's customer list was maintained in a special database which Schlack could not access. (Schlack Aff. ¶ 12)

*Technical Knowledge*

Schlack's job responsibilities required him to be familiar with the software and hardware infrastructure that supports EarthWeb's websites. Thus, Schlack has general knowledge of how EarthWeb customized and deployed the products of outside vendors and consultants in order to fit EarthWeb's programming needs. Schlack also gained an understanding of the technical problems that EarthWeb successfully tackled in order to make its websites operate efficiently. (Gollan Aff. ¶ 12)

However, Schlack had no access to EarthWeb's source codes or configuration files, so his knowledge of EarthWeb's proprietary software and infrastructure is necessarily limited. In addition, EarthWeb plans to revamp its software infrastructure in the near future, so any knowledge Schlack has may soon become obsolete. (Schlack Aff. ¶ 14; Gollan Aff. ¶ 19)

EarthWeb's main concern is Schlack's awareness of the trial and error process that EarthWeb undertook in implementing the products and services of outside consultants. (Gollan Reply Aff. ¶ 17) Armed with this knowledge, EarthWeb contends that Schlack would be able to solve similar technical problems if they arose at ITworld.com and thereby avoid the mistakes that EarthWeb made in the past. (Gollan Reply Aff. ¶ 19) EarthWeb claims that such information constitutes a trade secret.

In summary, Schlack was primarily responsible for determining what content EarthWeb licensed or acquired for its websites. In that capacity, Schlack was privy to information concerning a wide range of matters. Schlack often worked collaboratively with other department heads and employees on technology issues, marketing and advertising. (Gollan Aff. ¶ 7) While such matters may have been handled principally by other departments, Schlack's decisions concerning content directly impacted these aspects of EarthWeb's business, and thus it is not surprising that Schlack's input and analysis would have been essential.

Nevertheless, Schlack had no access to EarthWeb's advertiser list, source codes or configuration files. (Schlack Aff. ¶¶ 12, 14) Nor did Schlack have direct contact with EarthWeb's highest executive officers. (Schlack Aff. ¶ 16) He was not involved in developing or planning EarthWeb's overall business strategies and goals, and he had no access to company-wide financial reports or information. Thus, while the central nature of Schlack's position necessarily offered him a broad prespective over EarthWeb's day-to-day operations, in many important respects his access to highly confidential information was limited.

C. Schlack's Prospective *Position with ITworld.com*

At the moment, ITworld.com does not exist; the website is scheduled to be launched in January 2000. (Reinstein Aff.

¶ 3) According to its president and CEO, William Reinstein, ITworld.com will consolidate four online publications of IDG—*Computerworld, Network World, InfoWorld* and *CIO*—and three additional wholly-owned websites. When operational, ITworld.com will be a single website for IT professionals that contains news, product information and editorial opinions written primarily by an internal staff of more than 275 journalists. (Reinstein Aff. ¶¶ 11, 12)

Thus, in contrast to EarthWeb's emphasis on obtaining the products and services of third parties through acquisitions and licensing agreements and then making those materials readily accessible on its websites, ITworld.com will rely on original content for over 70% of its website's material. Content such as product reviews and technical research will be created in-house by ITworld.com's staff. (Reinstein Aff. ¶ 20)

Schlack contends that ITworld.com will also be distinguishable from EarthWeb in the type of audience it targets. While both EarthWeb and ITworld.com are intended to appeal to IT professionals, Schlack argues that the products and services offered by EarthWeb are aimed at programers and technicians, while ITworld.com will focus on upper level executives, such as technology managers and chief information officers. (Reinstein Aff. ¶ 28–29) EarthWeb disputes this assertion, and claims that it offers "a wide range of technology-related content" tailored to, *inter alia,* IT managers and chief information officers. (Gollan Aff. ¶ 3) EarthWeb also claims that it is presently pursuing an acquisition that would expand its ability to reach this select audience. (Gollan Reply Aff. ¶ 26) At the moment, however, EarthWeb's family of websites appears to offer a richer moraine of tech-

nical information while Computerworld.com concentrates on IT news in a magazine format.[3]

Given the dynamics of the Internet, such comparisons may be ephemeral. This underscores the difficulty in assessing the characteristics of ITworld.com, an embryonic business entity that will compete in a nascent industry which is evolving and re-inventing itself with breathtaking speed. Apart from the Reinstein affidavit, the only other description of what ITworld.com will ultimately do is contained in an undated memorandum submitted by defendant titled "Our Mission and the Opportunity." This four-page prolegomenon essentially extols the website's architecture, content and marketing strategy. While EarthWeb has dissected the document in an effort to identify potential similarities between EarthWeb and ITworld.com, the Court finds that exercise unpersuasive. The "mission" memorandum provides a visionary outline of what ITworld.com may eventually be, but fails to offer any meaningful description that transforms the idea into a perceptible reality.

### D. *The Employment Agreement*

On October 13, 1998, EarthWeb and Schlack executed an "Employment Agreement" memorializing certain terms and conditions of Schlack's employment. (Akerman Cert. Ex. B) The five-page agreement contains fourteen enumerated sections. Section one provides that Schlack's employment is "at-will." Section two addresses Schlack's compensation package and incorporates by reference an attached "offer letter." The letter, dated September 30, 1998, provides for an annual salary of $125,000, an annual performance-based bonus of $20,000, and the purchase of stock options. Section three provides a sweep-

---

**3.** Computerworld.com is expressly marketed as a "daily resource" for IT Leaders "to interact with their peers and to keep abreast of the issues, trends and specific technologies that affect their jobs every day. The site complements the print edition of Computerworld with a continuous feed of technology news and analysis, as well as research and other services not available anywhere else." (http://www.computerworld.com/inc/about.html)

ing and encyclopedic definition of the term "inventions", which is incorporated by reference in the following provision concerning non-disclosure of "proprietary information." [4]

Specifically, section four of the agreement, titled "Proprietary Information", provides in relevant part:

(a) [Schlack] will not disclose or use, at any time either during or after the term of employment, except at the request of EarthWeb or an affiliate of EarthWeb, any Confidential Information (as herein defined). "Confidential Information shall mean all proprietary information, technical data, trade secrets, and know-how, including, without limitation, research, product plans, customer lists, markets, software, developments, inventions, discoveries, processes, formulas, algorithms, technology, designs, drawings, marketing and other plans, business strategies and financial data and information, including but not limited to Inventions, whether or not marked as "Confidential." " "Confidential Information" shall also mean information received by EarthWeb from customers of EarthWeb or other third parties subject to a duty to keep confidential.

(Ackerman Cert. Ex. B)

Section five of the employment agreement is titled "Limited Agreement Not To Compete." That section provides in relevant part:

(c) For a period of twelve (12) months after the termination of Schlack's employment with EarthWeb, Schlack shall not, directly or indirectly:

(1) work as an employee, employer, consultant, agent, principal, partner, manager, officer, director, or in any other individual or representative capacity for any person or entity that directly competes with EarthWeb. For the purpose of this section, the term "directly competing" is defined as a person or entity or division on an entity that is

(i) an on-line service for Information Professionals whose primary business is to provide Information Technology Professionals with a directory of third party technology, software, and/or developer resources; and/or an online reference library, and or

(ii) an on-line store, the primary purpose of which is to sell or distribute third party software or products used for Internet site or software development[.]

(Ackerman Cert. Ex. B)

### E. *The Parties' Contentions*

EarthWeb argues that under the "non-compete" provision of the employment agreement, Schlack should be enjoined from commencing employment with IT-world.com because that company will "directly compete" with EarthWeb, and because enforcement of the agreement is necessary to prevent the disclosure of EarthWeb's trade secrets. (Pl.'s Mem. at 9–10). EarthWeb also contends that Schlack's services to EarthWeb are unique and extraordinary, thereby providing a further basis for enforcement of the non-compete provision. EarthWeb further asserts that under section four of the employment agreement barring the disclosure

---

4. Section three defines "Inventions" as "all ideas, potential marketing and sales relationships, inventions, copyrightable expression, research, plans for products or services, business development strategies, marketing plans, computer software (including, without limitation, source code), computer program, original works of authorship, characters, know-how, trade secrets, information, data, developments, discoveries, improvements, modifications, technology, algorithms and designs, whether or not subject to patent or copyright protection, made, conceived, expressed, developed, or actually or constructively reduced to practice by [Schlack] solely or jointly with others during the terms of [Schlack's] employment with EarthWeb, which refer to, are suggested by, or result from any work which [Schlack] may do during his[ ] employment, or from any information obtained from EarthWeb or any affiliate of EarthWeb, such that said information is obtained in the performance of duties related to employment at EarthWeb." (Akerman Cert. Ex. B)

**308**

or use of "proprietary information", preliminary injunctive relief is necessary because Schlack will inevitably disclose EarthWeb's trade secrets during the course of his employment at ITworld.com. EarthWeb claims that since disclosure of trade secrets would be inevitable, Schlack may be enjoined from working for ITworld.com under this provision. (Akerman Reply Aff. ¶ 6) Finally, EarthWeb suggests that the doctrine of "inevitable disclosure" provides an independent basis upon which Schlack should be enjoined.

In contrast, Schlack argues that by its terms, the "limited" non-compete provision to which he agreed does not apply to his employment with ITworld.com because that company's "primary business" will not involve offering "a directory of third party technology," an "online reference library" or an "online store." (Agreement, Sec. 5(c), Ackerman Cert. Ex. B) Schlack also denies having knowledge of any trade secrets belonging to EarthWeb and he disputes EarthWeb's characterization of his services as unique and extraordinary. Finally, Schlack contends that any trade secrets of EarthWeb that he might remember would be of no value to ITworld.com, and hence would not be disclosed or used by him, because the two companies will be fundamentally different in the way they acquire and publish content.

As mentioned above, *supra,* n. 2, this case does *not* involve the actual misappropriation or theft of trade secrets. When EarthWeb first appeared before this Court on September 28, 1999, it conceded that it had no evidence that Schlack had copied or otherwise absconded with documents allegedly containing trade secrets of EarthWeb. During oral argument on October 12, 1999, having had the opportunity to depose Schlack and to conduct further investigation into the matter, EarthWeb acknowledged that it had no evidence of any wrongdoing by Schlack apart from his alleged breach of the employment agreement. (Tr. 12)

*Discussion*

A. The Preliminary Injunction *Standard*

█ Preliminary injunctive relief is "an extraordinary and drastic remedy which should not be routinely granted." *Medical Society of the State of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977); *see also Computer Associates Intern., Inc. v. Bryan,* 784 F.Supp. 982, 986 (E.D.N.Y. 1992). Accordingly, the movant has the burden of establishing the following elements: "(1) irreparable harm or injury, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the movant." *Computer Assocs.,* 784 F.Supp. at 986 (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979)).

█ A demonstration of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983). The mere possibility of harm is not sufficient: the harm must be imminent and the movant must show it is likely to suffer irreparable harm if equitable relief is denied. *See JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990); *Computer Assocs.,* 784 F.Supp. at 986. If irreparable harm is remote, speculative, or a mere possibility, the motion must be denied. *See Borey v. National Union Fire Ins. Co.,* 934 F.2d 30, 34 (2d Cir.1991); *Reuters Ltd. v. United Press Intern., Inc.,* 903 F.2d 904, 907 (2d Cir.1990).

B. Inevitable Disclosure of Trade Secrets As *Irreparable Harm*

█ In this circuit, irreparable harm may be presumed if a trade secret has been misappropriated. A trade secret, once lost, is lost forever; its loss cannot be measured in money damages. *See North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 49 (2d Cir.1999) (quoting *FMC*

*Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir.1984)).

■ It is also possible to establish irreparable harm based on the inevitable disclosure of trade secrets, particularly where the movant competes directly with the prospective employer and the transient employee possesses highly confidential or technical knowledge concerning manufacturing processes, marketing strategies, or the like. Such a risk was present in *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995), where the Seventh Circuit analogized the former employer's predicament to that of "a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." *PepsiCo,* 54 F.3d at 1270. Similarly, in *Lumex, Inc. v. Highsmith,* 919 F.Supp. 624 (E.D.N.Y.1996), the district court found a risk of inevitable disclosure based on, *inter alia,* the employee's access to highly sensitive information concerning manufacturing costs, pricing structure and new products, plus the fact that the industry in question was a "'copy cat' or cloning industry." *Lumex,* 919 F.Supp. at 629. *See also International Paper Company v. Suwyn,* 966 F.Supp. 246, 258–59 (S.D.N.Y.1997); *Business Intelligence Services, Inc. v. Hudson,* 580 F.Supp. 1068, 1072 (S.D.N.Y.1984); *Continental Group, Inc. v. Kinsley,* 422 F.Supp. 838, 844–45 (D.Conn.1976); *Doubleclick, Inc. v. Henderson,* 1997 WL 731413, *5 (N.Y.Sup.1997); *accord Delphine Software Intern. v. Electronic Arts, Inc.,* 1999 WL 627413, *3 (S.D.N.Y. Aug.18, 1999)(99 Civ. 4454(AGS)) ("It is true that the case law suggests that a person in possession of trade secrets, when working on a similar project, may 'inevitably disclose' the proprietary information and techniques of which he is in possession.").

The inevitable disclosure doctrine is not new. For example, in *Eastman Kodak Co. v. Powers Film Products,* 189 A.D. 556, 179 N.Y.S. 325 (4th Dep't 1919), the court enforced a non-compete covenant where the departing employee possessed information about Eastman Kodak's secret film manufacturing processes and formulas that he would have inevitably used in performing his new job duties for a competitor. However, more recent cases are notable because they have enjoined employees from working for competitors in the absence of an express non-compete agreement.

*PepsiCo* is a leading example. In that case the employee, Redmond, signed a confidentiality agreement at the outset of his employment, but he did not sign a non-compete agreement. Redmond worked within the highly competitive sports-drink industry, and he eventually became a general manager for a business unit that had annual revenues of over $500 million per year and accounted for twenty percent of PepsiCo's profit for all of the United States. *See PepsiCo,* 54 F.3d at 1264. Redmond's position made him privy to information such as PepsiCo's national and regional marketing strategies for the upcoming year. *Id.* at 1265–66. He was recruited for a similar, high level position with Quaker Oats, a direct competitor of PepsiCo in the sports drink industry. Under these circumstances, the court effectively converted Redmond's confidentiality agreement into a non-compete agreement by enjoining him from working for a direct competitor of PepsiCo for a sixth month period.[5]

*Doubleclick* is also instructive. The defendants in *Doubleclick* were two senior executives for an Internet advertising company who were caught misappropriating trade secrets as they surreptitiously plotted to form their own company to compete directly with their former employer. Both defendants had signed confidentiality agreements and while one of them had also signed a non-compete agreement, although

---

**5.** The Seventh Circuit also relied on an Illinois statute, the Illinois Trade Secrets Act, which provides that a court may enjoin the "actual or threatened misappropriation" of a trade secret. *See* 765 ILCS 1065/3(a). New York has not enacted a similar statute.

its applicability was disputed. Based on the evidence of actual misappropriation, which was "bolstered by ... a high probability of 'inevitable disclosure' of trade secrets", the court enjoined the defendants from launching their company, or accepting employment with any competing company, for a period of six months. *Doubleclick*, 1997 WL 731413, at *5–6.

While *Doubleclick* appears to represent a high water mark for the inevitable disclosure doctrine in New York, its holding rests heavily on evidence of the defendants' overt theft of trade secrets and breaches of fiduciary duty. *See Doubleclick*, 1997 WL 731413, at *7. Such misconduct has long been recognized as an appropriate ground for enjoining the disclosure of trade secrets, irrespective of any contract between the parties. *See, e.g., ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir.1983); *Inflight Newspapers, Inc. v. Magazines In–Flight, LLC*, 990 F.Supp. 119, 137 (E.D.N.Y.1997) ("[A]n employee's use of an employer's trade secrets or confidential customer information can be enjoined even in the absence of a restrictive covenant when such conduct violates a fiduciary duty owed by the former employee to his former employer.") (quoting *Churchill Communications Corp. v. Demyanovich*, 668 F.Supp. 207, 211 (S.D.N.Y.1987); *Webcraft Technologies, Inc. v. McCaw*, 674 F.Supp. 1039, 1047–48 (S.D.N.Y.1987); *Byrne v. Barrett*, 268 N.Y. 199, 206–07, 197 N.E. 217, 218–19 (1935); *Advance Biofactures Corp. v. Greenberg*, 103 A.D.2d 834, 478 N.Y.S.2d 344 (2d Dep't 1984); *Hecht Foods, Inc. v. Sherman*, 43 A.D.2d 850, 351 N.Y.S.2d 711 (2d Dep't 1974)). However, in cases that do not involve the actual theft of trade secrets, the court is essentially asked to bind the employee to an implied-in-fact restrictive covenant based on a finding of inevitable disclosure. This runs counter to New York's strong public policy against such agreements and circumvents the strict judicial scrutiny they have traditionally required. Indeed, in post-employment disputes that do not involve trade

secrets or tortious conduct on the part of the employee, restrictive covenants may not be implied. *See American Federal Group, Ltd. v. Rothenberg*, 136 F.3d 897, 908–09 (2d Cir.1998); *American Broadcasting Companies v. Wolf*, 52 N.Y.2d 394, 406, 438 N.Y.S.2d 482, 488, 420 N.E.2d 363 (1981).

■■ Thus, in its purest form, the inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory. Absent evidence of actual misappropriation by an employee, the doctrine should be applied in only the rarest of cases. Factors to consider in weighing the appropriateness of granting injunctive relief are whether: (1) the employers in question are direct competitors providing the same or very similar products or services; (2) the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; and (3) the trade secrets at issue are highly valuable to both employers. Other case-specific factors such as the nature of the industry and trade secrets should be considered as well.

While the inevitable disclosure doctrine may serve the salutary purpose of protecting a company's investment in its trade secrets, its application is fraught with hazards. Among these risks is the imperceptible shift in bargaining power that necessarily occurs upon the commencement of an employment relationship marked by the execution of a confidentiality agreement. When that relationship eventually ends, the parties' confidentiality agreement may be wielded as a restrictive covenant, depending on how the employer views the new job its former employee has accepted. This can be a powerful weapon in the hands of an employer; the risk of litigation alone may have a chilling effect on the employee. Such constraints should be the product of open negotiation.

Another drawback to the doctrine is that courts are left without a frame of reference because there is no express non-compete agreement to test for reasonableness. Instead, courts must grapple with a decidedly more nebulous standard of "inevitability." The absence of specific guideposts staked-out in a writing will only spawn such litigation, especially as the Internet becomes a primary medium for ideas and commerce. Clearly, a written agreement that contains a non-compete clause is the best way of promoting predictability during the employment relationship and afterwards.

■ Of course, that is precisely what Schlack got with EarthWeb. Section five of the parties' employment agreement is a "limited" restrictive covenant in which Schlack agrees not to compete with EarthWeb in three narrow categories of employment: companies whose "primary business" is providing IT professionals with (1) "directory" of third party technology, (2) an "online reference library", or (3) an "online store." (Agreement, Sec. 5(c), Ackerman Cert. Ex. B) On the other hand, section four of the employment agreement contains extremely broad language concerning non-disclosure of "proprietary information." (Agreement, Sec. 4(a), Ackerman Cert. Ex. B)

Schlack viewed this distinction as critical and says he would not have knowingly agreed to a post-employment restraint on his ability to work in the field of IT journalism on the Internet. (Schlack Aff. ¶ 5) EarthWeb, however, appears to gloss over the distinctness of these provisions which it drafted. Under the banner of inevitable disclosure doctrine, EarthWeb contends that Schlack should be enjoined from working for any Internet company that targets IT professionals. Thus, at oral argument EarthWeb indicated that Schlack was free to work for an "organiza-tion that appealed to consumers that were interested in buying technology for themselves or people who are just plain consumers as opposed to [ ] IT professionals, which would be in the same area." (Tr. 56)

This Court declines to re-write the parties' employment agreement under the rubric of inevitable disclosure and thereby permit EarthWeb to broaden the sweep of its restrictive covenant. As discussed above, such retroactive alterations distort the terms of the employment relationship and upset the balance which courts have attempted to achieve in construing non-compete agreements.

The Court finds further support for a strict construction of the employment agreement based on its rather onerous terms. The agreement provided that Schlack's employment was at-will. While it contained a restrictive covenant, it made no provision for the payment of severance to Schlack in the event that EarthWeb terminated his employment. Moreover, EarthWeb purported to "reserve[ ] the right to modify the terms of this Agreement on a quarterly basis, subject to notice and acknowledgment by the Employee of such modifications." (Agreement, Sec. 13, Gollan Aff. Ex. B) Read collectively, the effect of these provisions is to indenture the employee to EarthWeb.[6] This Court will not allow EarthWeb to expand the agreement's confidentiality provision so that it potentially has that result. Nor can EarthWeb make an end-run around the agreement by asserting the doctrine of inevitable disclosure as an independent basis for relief.

Accordingly, EarthWeb's entitlement to a preliminary injunction enjoining Schlack's future employment must be found to rest, if at all, on the restrictive covenant it drafted, and not on a confidentiality provision conflated with the theory

---

**6.** On September 24, 1999, EarthWeb sought to supplement the non-compete provision by offering Schlack the "opportunity" to work as a consultant from his home in Massachusetts writing monthly columns and representing EarthWeb at public functions in return for continued payment of his present salary for one year. (Gollan Aff. ¶ 26)

of inevitable disclosure. With this framework in mind, the Court turns to the specific terms of the employment agreement at issue here.

## C. *The Non–Compete Provision*

By its terms, EarthWeb's non-compete provision only restricts Schlack from working for a company that is: "(i) an on-line service for Information Professionals whose primary business is to provide Information Technology Professionals with a directory of third party technology, software, and/or developer resources; and/or an online reference library, and or (ii) an on-line store, the primary purpose of which is to sell or distribute third party software or products used for Internet site or software development[.]" EarthWeb argues that ITworld.com will provide each of these services based on its interpretation of the "mission" memorandum and its review of the four IDG websites which Schlack is being hired to integrate. (Pl.'s Mem. at 9–10; Gollan Aff. ¶¶ 23–24)

■ Schlack responds that ITworld.com's primary business will not involve any of these activities. Through Reinstein's affidavit, Schlack argues that ITworld.com's primary focus will be to publish news, analysis and product information that is generated daily by its own editorial staff. (Reinstein Aff. ¶ 20) Reinstein explains that ITworld.com may, for example, offer some form of "directory of developer resources", but he states that this directory "will constitute not more than 2% of ITworld.com's offerings and revenues when we go online." (Reinstein Aff. ¶ 18(3)). Since EarthWeb's restrictive covenant only proscribes Schlack from working for companies whose "primary business" falls within a specified category, Schlack argues that such *de minimis* aspects of ITworld.com's content do not fall within the scope of the provision.

This Court agrees. EarthWeb has no probative basis for refuting Reinstein's description of what ITworld.com intends to do. Gollan's conclusions about what he expects from ITworld.com are speculative and, as discussed above, the Court finds the "mission" memorandum to be of little utility. So too, the Court attaches only minimal weight to Reinstein's September 2, 1999 e-mail to Schlack referring to their meeting as one between "potential competitors." (Gollan Reply Aff. Ex. C) That apparently glib remark cannot be fairly understood as referring to the terms of Schlack's employment agreement. Moreover, EarthWeb and ITworld.com are competitors in that their products, while different, are delivered via the Internet and targeted for the IT market. EarthWeb's argument that ITworld.com's "primary business" could change in the next few months before the website is launched only serves to highlight a fundamental weakness in EarthWeb's position: as the moving party, EarthWeb bears the heavy burden of demonstrating that it is entitled to preliminary injunctive relief now.

■ Even if the terms of EarthWeb's restrictive covenant reached Schlack's prospective employment at ITworld.com, EarthWeb would still have to establish that the restraint is reasonable and necessary to protect its legitimate interests. In New York, non-compete covenants will be enforced only if reasonably limited in scope and duration, and only "to the extent necessary (1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique." *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 70 (2d Cir.1999); *accord BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 388–89, 690 N.Y.S.2d 854, 856–57, 712 N.E.2d 1220 (1999); *Reed, Roberts Assoc., Inc. v. Strauman,* 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679, 353 N.E.2d 590 (1976); *Business Networks of New York, Inc. v. Complete Network Solutions Inc.,* —— A.D.2d ——, 696 N.Y.S.2d 433, 434 (1st Dep't, 1999).

The policy underlying this strict approach rests on notions of employee mobility and free enterprise. "[O]nce the term of an employment agreement has expired, the general public policy favoring robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition." *American Broadcasting*, 52 N.Y.2d at 404, 438 N.Y.S.2d at 487, 420 N.E.2d 363. "Important, too, are the 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." *Id.* (quoting *Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604, 196 N.E.2d 245 (1963)). On the other hand, "the employer is entitled to protection from unfair or illegal conduct that causes economic injury." *American Broadcasting*, 52 N.Y.2d at 404, 438 N.Y.S.2d at 487, 420 N.E.2d 363; *see also Reed, Roberts Assoc.*, 40 N.Y.2d at 308, 386 N.Y.S.2d at 680, 353 N.E.2d 590; *Greenwich Mills Co. v. Barrie House Coffee Co.*, 91 A.D.2d 398, 400, 459 N.Y.S.2d 454, 456 (2d Dep't 1983).

Applying these principles here, EarthWeb's restrictive covenant would fail to pass muster even if Schlack's position at ITworld.com fell within the provision's relatively narrow parameters.

### 1. Duration

■■■■■ As a threshold matter, this Court finds that the one-year duration of EarthWeb's restrictive covenant is too long given the dynamic nature of this industry, its lack of geographical borders, and Schlack's former cutting-edge position with EarthWeb where his success depended on keeping abreast of daily changes in content on the Internet. By comparison, the court in *Doubleclick* enjoined the defendants for only a six-month period. The *Doubleclick* court observed that "[g]iven the speed with which the Internet advertising industry apparently changes, defendants' knowledge of DoubleClick's operation will likely lose value to such a degree that the purpose of a preliminary injunction will have evaporated before the year is up." *Doubleclick*, 1997 WL 731413, at *8. Similar considerations predominate here, making a one-year restrictive covenant unreasonably long. While courts may "blue pencil" such provisions to make them shorter and hence enforceable, *see Karpinski v. Ingrasci*, 28 N.Y.2d 45, 51–52, 320 N.Y.S.2d 1, 6–7, 268 N.E.2d 751 (1971), this Court would decline to exercise its discretion to do so in this case because, as discussed above, the employment agreement as a whole overreaches. *See generally Webcraft*, 674 F.Supp. at 1047.

### 2. Unique and Extraordinary Services

■■■■■ Contrary to EarthWeb's contention, Schlack's services are not "unique and extraordinary." Such characteristics have traditionally been associated with "various categories of employment where the services are dependent on an employee's special talents; such categories include musicians, professional athletes, actors and the like." *Ticor*, 173 F.3d at 70; *accord Bradford v. New York Times Company*, 501 F.2d 51 (2d Cir.1974) (second-highest ranking executive of the newspaper in charge of all business operations and reporting directly to the publisher); *Maltby v. Harlow Meyer Savage, Inc.*, 166 Misc.2d 481, 633 N.Y.S.2d 926 (N.Y.Sup. 1995), *aff'd*, 223 A.D.2d 516, 637 N.Y.S.2d 110 (1st Dep't), *leave to appeal dismissed*, 88 N.Y.2d 874, 645 N.Y.S.2d 448, 668 N.E.2d 419 (1996). However, in order to justify a enforcement of a restrictive covenant,

> [m]ore must ... be shown to establish such a quality than that the employee excels at his work or that his performance is of high value to his employer. It must also appear that his services are of such character as to make his replacement impossible or that the loss of such services would cause the employer irreparable injury.

*American Institute of Chemical Engineers v. Reber–Friel Co.*, 682 F.2d 382, 390 n.9 (2d Cir.1982) (quoting *Purchasing Associ-*

*ates,* 13 N.Y.2d at 274, 246 N.Y.S.2d at 605, 196 N.E.2d 245); *see also International Paper,* 966 F.Supp. at 259. EarthWeb has not shown that the nature of Schlack's services are unique or that he cultivated the type of special client relationships that the Second Circuit found worthy of protection in *Ticor.*

### 3. *Trade Secrets*

 Under New York law, a trade secret is defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *Haber,* 188 F.3d at 44 (quoting Restatement of Torts, § 757 cmt. b (1939)); *see also Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.,* 118 F.3d 955, 968 (2d Cir.1997), *cert. denied,* 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998); *Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 917–18, 624 N.E.2d 1007 (1993) (quoting the Restatement definition).

 New York courts consider the following factors in determining whether information constitutes a trade secret: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Ashland Management,* 82 N.Y.2d at 407, 604 N.Y.S.2d at 918, 624 N.E.2d 1007 (quoting Restatement of Torts § 757 cmt. b); *accord North Atlantic,* 188 F.3d at 44. The most important consideration is whether the information was kept secret. *See Lehman v. Dow Jones & Co.,* 783 F.2d 285, 298 (2d Cir.

1986). This requires that the owner of a trade secret take reasonable measures to protect its secrecy.

Of the four broad categories of trade secrets alleged by EarthWeb—strategic content planning, licensing agreements and acquisitions, advertising and technical knowledge—only information falling within the first category is arguably entitled to trade secret protection in this case.

 With respect to strategic content planning, EarthWeb contends that Schlack is intimately familiar with the "strategic thinking" behind the company's websites and its overall business plan. To that end, EarthWeb has submitted internal documents in support of its motion that show Schlack's editorial involvement in decisions relating to content. (Gollan Reply Aff., Ex. A, pp. 878, 953–57, 958–61, 1089, 1092–97) While some of the websites on which Schlack worked have already been launched, others have not. (Gollan Reply Aff. Ex. A, pp. 825–27, 837–44, 872–75, 884–88, 891–95) Nonetheless, in either case EarthWeb argues that Schlack is aware of "the specific target audiences to which each website is directed, why certain content is grouped or aggregated in the manner it is in order to attract and retain the intended audience, and the gaps or holes in the content at each website, and EarthWeb's plans for improving the sites . . . ." (Gollan Reply Aff. ¶ 6)

In some contexts, courts have found that particularized marketing plans, costing and price information may constitute trade secrets. *See e.g., PepsiCo,* 54 F.3d at 1269–70; *Lumex,* 919 F.Supp. at 629–30. EarthWeb has established, at least at this stage in the proceedings, that Schlack had access to such information. In some respects, however, EarthWeb's proof on this issue is weak. For example, unlike the executives in *PepsiCo* and *Lumex,* Schlack did not routinely communicate with EarthWeb's upper management. *Compare Lumex,* 919 F.Supp. at 630 (employee "was privy to discussions involving future Cybex markets, products on the drawing board

and new prototypes, was a member of the elite strategic planning committee together with the top personnel of Cybex and attended high level meetings in which future restructuring of Cybex was discussed, together with detailed financial information, including costs and Lumex profit margins.").

In addition, a serious question remains as to whether the "strategic thinking" behind EarthWeb's websites is necessarily revealed when those websites are launched on the Internet, and therefore not entitled to trade secret protection. *See Hudson Hotels Corp. v. Choice Hotels Intern.*, 995 F.2d 1173, 1177 (2d Cir.1993) (once a new product is introduced, it can no longer be used secretly and continuously in business, and therefore cannot constitute a protectible trade secret); *Boyle v. Stephens, Inc.*, 1997 WL 529006, *4–5 (S.D.N.Y. Aug.26, 1997) (97 Civ.1351 (SAS)) (new product concept for allocating risk among investors in mutual fund did not constitute trade secret); *Eagle Comtronics, Inc. v. Pico, Inc.*, 89 A.D.2d 803, 453 N.Y.S.2d 470, 472 (4th Dep't 1982) (trap and filter device used in the cable television industry is not a trade secret because, *inter alia*, any secrecy in its design "was lost when it was placed upon the market"), *appeal denied*, 58 N.Y.2d 601, 458 N.Y.S.2d 1025, 444 N.E.2d 1012 (1982). Finally, even if Schlack knows where the "gaps or holes" remain in particular websites (Gollan Aff. ¶ 6), EarthWeb has not cited any case law for the proposition that a product's perceived deficiencies are trade secrets.

■ With respect to licensing agreements and acquisitions, EarthWeb similarly fails to make out a compelling case. Schlack claims that the existence and terms of licensing agreements are generally not secret. Further, Schlack's knowledge of such matters is limited to his recollection; EarthWeb does not allege that he has misappropriated copies of any contracts or client lists. Both factors weigh heavily against EarthWeb's argument that its licensing activities are trade

secrets. *See, e.g., Reed, Roberts Assocs.*, 40 N.Y.2d at 308, 386 N.Y.S.2d at 680, 353 N.E.2d 590 (where former employer's past or prospective customer names can be readily ascertained from sources outside its business, "trade secret protection will not attach"); *Briskin v. All Seasons Services, Inc.*, 206 A.D.2d 906, 615 N.Y.S.2d 166, 167 (4th Dep't 1994) (identity of potential customers were readily available and price structures varied depending on needs and preferences of customer); *Arnold K. Davis & Co., Inc. v. Ludemann*, 160 A.D.2d 614, 616, 559 N.Y.S.2d 240 (1st Dep't 1990) (denying injunctive relief where former employee was able to contact employer's customers based on his recollection and not a misappropriated list). Finally, although Schlack may have some knowledge of EarthWeb's future acquisition plans, such information, while confidential, is generally not considered a trade secret. *See Lehman*, 783 F.2d at 297–98 (information regarding availability of a certain company for merger, and the attractiveness of such an endeavor, was not a "process or device for continuous use in the operation of a business," but rather "information as to single or ephemeral events" that does not qualify as a trade secret under the Restatement definition); *Emtec, Inc. v. Condor Technology Solutions, Inc.*, 1998 WL 834097, at *8 (E.D.Pa. Nov. 30, 1998) ("The identities of two companies as possible acquisition targets is not the type of information meant to be protected as a trade secret.").

■ Turning to the last two categories of alleged trade secrets, advertising and technical knowledge, the Court finds little in the record that could rise to the status of a trade secret. Schlack's involvement with advertising at EarthWeb was tangential, and it is well established that "an employee's recollection of information pertaining to specific needs and business habits of particular customers is not confidential." *Walter Karl, Inc. v. Wood*, 137 A.D.2d 22, 28, 528 N.Y.S.2d 94, 98 (2d

Dep't 1988); *see also Ivy Mar Co., Inc. v. C.R. Seasons Ltd.*, 907 F.Supp. 547, 558 (E.D.N.Y.1995); *Catalogue Serv. of Westchester, Inc. v. Henry*, 107 A.D.2d 783, 784, 484 N.Y.S.2d 615, 616 (2d Dep't 1985).

■■■ With respect to technical matters, the Court doubts that Schlack's generalized level of input permitted him access to the type of information traditionally afforded trade secret protection. (Gollan Reply Aff., Ex. A, pp. 418–19, 425–27, 505–16, 681–84, 828–44, 845–50, 851–55, 856–57, 905, 993–1003, 1004–1034, 1051–52, 1053–54) Here, as in *Inflight Newspapers*, the Court draws a distinction between pursuing "a general conceptual goal [by] incorporating specific needs and wants in the form of instructions for a programmer" and the nuts and bolts of actually designing the software and hardware architecture. *Inflight Newspapers*, 990 F.Supp. at 130. Schlack appears to have done only the former, and thus contrary to EarthWeb's assertion, this case is distinguishable from *Integrated Cash Mgmt. Services, Inc. v. Digital Transactions, Inc.*, 732 F.Supp. 370, 375–76 (S.D.N.Y.1989), *aff'd*, 920 F.2d 171 (2d Cir.1990), where the former employees actively participated in writing the computer programs at issue. Obviously, Schlack need not have been a programmer to have been exposed to technology constituting a trade secret, but it does not appear that his editorial responsibilities placed him in the requisite proximity. Further, while Schlack's experience at EarthWeb in addressing costly, developmental problems may prove useful in his position at ITworld.com or elsewhere, "an employee may not be restrained from using the general techniques learned during his [former] employment." *Advance Biofactures Corp. v. Greenberg*, 103 A.D.2d 834, 836, 478 N.Y.S.2d 344, 346 (2d Dep't 1984); *see also Cataphote Corp. v. Hudson*, 444 F.2d 1313, 1316–17 (5th Cir. 1971).

#### 4. *The Risk Of Disclosure*

■■■ To the limited extent that EarthWeb has shown that Schlack is aware of information that could be afforded trade secret protection, EarthWeb has not established an imminent and inevitable risk of disclosure warranting preliminary relief. ITworld.com's ability to generate the bulk of its content in-house sets it apart from EarthWeb in important ways, even though both companies will target the IT market. For example, Schlack would compromise his independence as an editor at ITworld.com if he involved himself in the advertising aspects of that entity. (Schlack Aff. ¶ 13) Moreover, ITworld.com has indicated that Schlack's position will simply not involve matters involving licensing, subscription pricing or acquisitions. (Reinstein Aff. ¶¶ 43, 45–47)

Based on these facts, the Court finds no imminent risk that Schlack will disclose or use EarthWeb's trade secrets in connection with his employment at ITworld.com. Consequently, EarthWeb has failed to demonstrate a likelihood of irreparable injury entitling it to judicial enforcement of the restrictive covenant, even if that covenant were applicable by its terms and otherwise reasonable in duration. The Court further finds that enforcement of this provision would work a significant hardship on Schlack. When measured against the IT industry in the Internet environment, a one-year hiatus from the workforce is several generations, if not an eternity. Clearly, the balance of hardships tips decidedly in favor of the defendant.

#### D. *The Non–Disclosure Provision*

Having found that EarthWeb cannot establish irreparable harm based on the possible disclosure of trade secrets, this Court is unable to conclude that a similar risk looms with respect to the disclosure of confidential information as that term is defined in the employment agreement.

This branch of EarthWeb's application will have to abide pretrial discovery.

### E. *The Sealing Order*

Both parties have moved separately to seal certain portions of the papers submitted in connection with EarthWeb's motion for preliminary relief. Having reviewed the materials in question and considered, *inter alia*, the factors suggested by *Bergen Brunswig Corp. v. Ivax Corp.*, 1998 WL 113976 (S.D.N.Y. Mar.12, 1998) (97 Civ. 2003(PKL)), both motions are granted. As to the four-page memorandum titled "Our Mission and the Opportunity", that entire document shall be filed under seal, and all excerpts from it appearing in the parties' respective motion papers shall be redacted to the extent such excerpts contain "confidential" information as defined in paragraph 8 of the October 8, 1999 affidavit of William Reinstein.

### F. *Conclusion*

For all these reasons, plaintiff's motion for a preliminary injunction is denied, and the temporary restraining order entered by this Court on September 28, 1999 and thereafter extended on October 12, 1999 is dissolved. In addition, the parties' respective applications to seal portions of the record on plaintiff's motion for a preliminary injunction are granted as set forth above.

SO ORDERED.